Filed 4/29/21

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| CHARLES RATCLIFF, JR., et al. | B302558 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 19STCV20138) |
| v. | |
| THE ROMAN CATHOLIC ARCHBISHOP OF LOS ANGELES et al., | |
| Defendants and Appellants. | |


APPEAL from an order of the Superior Court of Los Angeles County, Elizabeth R. Feffer, Judge.  Affirmed.

McKool Smith Hennigan, J. Michael Hennigan, Lee W. Potts and Elizabeth S. Lachman for Defendants and Appellants.

Law Offices of Anthony DeMarco, Anthony M. DeMarco; Esner, Chang & Boyer, Holly N. Boyer and Shea S. Murphy for Plaintiffs and Respondents.

—————————————

Seven adults allege they were molested by a priest when they were children.  They brought suit against The Roman Catholic Archbishop of Los Angeles and related entities (Archdiocese or defendants), alleging it was vicariously liable for ratifying the molestation and directly liable for its own negligence in failing to supervise the priest.  The Archdiocese moved to strike the operative complaint under the anti-SLAPP law (Code Civ. Proc., § 425.16), arguing that some of the acts by which it purportedly ratified the molestation or failed to supervise the priest constituted speech or litigation conduct protected by the anti-SLAPP statute.  We disagree; the gravamen of the suit against the Archdiocese is not speech – it is the molestation and failure to supervise.  We therefore affirm the trial court's denial of the anti-SLAPP motion.

### FACTUAL AND PROCEDURAL BACKGROUND

### 1.  The Parties

Plaintiffs are seven alleged molestation victims; some sued in their own names, others preferred a "John Doe" designation.  As their identities were revealed in discovery, the Archdiocese calls them all by their names in its briefs on appeal.  In contrast, plaintiffs continue the naming conventions of their complaint, using names for some plaintiffs and John Does for others.  In an abundance of caution, and to aid readability, we refer to the plaintiffs, in chronological order of alleged molestation, as Doe 1 through Doe 7.

Defendants are The Roman Catholic Archbishop of Los Angeles, a corporation sole; the Archdiocese of Los Angeles Education and Welfare Corporation; and three individual Catholic churches where the molestation allegedly occurred (St. Christopher, St. Mary, and St. Lawrence Martyr).  At the time

2

the anti-SLAPP motion was granted, the trial court also sustained with leave to amend the defendants' demurrer, on the grounds of lack of specificity. The trial court expressed concern that the operative complaint was not clear as to which complainant was alleging which cause against which defendant. For our purposes and unless the context requires otherwise, it is sufficient to refer to the defendants collectively as the Archdiocese.

The priest who allegedly committed the molestation, Father Christopher Cunningham, is not a named defendant. This action alleges that the Archdiocese is liable for Father Cunningham's alleged acts of molestation.

## 2. *The Facts as Alleged in the First Amended Complaint*

The operative complaint is the first amended complaint. The allegations paint the picture of an Archdiocese which was willfully blind to its strong suspicions – and, perhaps, actual knowledge – of Father Cunningham's misconduct. Plaintiffs allege that, rather than taking curative action in response to suspicions of and accusations against Father Cunningham with investigations, supervision, and limitation of his access to children, the Archdiocese swept the charges under the proverbial rug and simply reassigned Father Cunningham to another parish, where he was free to molest again.

We discuss the allegations in some detail, with particular attention to the allegations by which plaintiffs assert the Archdiocese is liable for Father Cunningham's acts of abuse and molestation.[1]

---

[1] As we shall discuss, the anti-SLAPP analysis has two prongs – first, whether the complaint arises from protected activity as described in the anti-SLAPP statute; and second,

3

A.    *The Archdiocese's Preexisting Policy for the Prevention of Child Molestation by Priests*

By 1989, prior to Father Cunningham's ordination, the Archdiocese had received complaints that no less than 22 of its priests had sexually molested children.  It therefore "reduced to writing its policies for the prevention of child molestation by its priests," and provided a copy to all priests.  "The policy prohibited priests:  (1) having minors in their living quarters; (2) taking minors on unchaperoned outings; [and] (3) tickling, wrestling, kissing or hugging minors."

Father Cunningham was ordained a priest in the Archdiocese in 1990, when the written policy was in effect.

B.    *First Parish – Doe 1*

Father Cunningham was first assigned to be an associate pastor at St. Christopher.  As alleged, "Soon after his arrival he began wrestling minors, tickling them, and asking them to go with him unchaperoned to movies and other fun activities."  This was done openly on the school playground, visible to parish employees.

One of the boys who received the attention of Father Cunningham was 12-year-old Doe 1, whose mother worked at the

---

whether the plaintiff has established a probability of prevailing. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).)  We resolve this appeal on the first prong – whether the allegations of the complaint arise from protected activity.  The evidence submitted by both parties related to the second prong – whether the plaintiffs have a probability of prevailing – is not relevant to the issue of whether the complaint arises from protected activity.  We nevertheless include a detailed statement of the factual allegations in order to provide context for our analysis of the first prong.

church.  One day in 1991, when Father Cunningham was aware that Doe 1's mother was away on church business, Father Cunningham went to Doe 1's home.  He went to the door and asked for Doe 1's mother; Doe 1 told Father Cunningham that his mother was not home and Father Cunningham could not come in.  Father Cunningham entered anyway, and sat down on the sofa next to the boy.  Father Cunningham rubbed the boy's back and thigh, despite Doe 1's attempts to move away.  Father Cunningham was interrupted by Doe 1's mother, who had come home early.  She told Father Cunningham that he was not permitted in their home without her permission.  She reported the conduct to a nun at the church and the church school's principal.  Doe 1 also complained to the parish pastor.  Father Cunningham continued his prohibited interactions with young boys unabated, "taking them to the movies, giving them gifts, playing with them and tickling them."  Doe 1's mother believed this was "sexualized conduct" and that he was "grooming young boys."

C.     *Second Parish – Does 2, 3 and 4*

In 1994, Father Cunningham was assigned as an associate pastor at St. Mary.  That year, the Archdiocese updated its policy for the prevention of child molestation; now, the policy required any priest who became aware of a fellow priest's violation of the policy to confront the violator and report the violation to the Vicar for Clergy.

According to the complaint, at St. Mary's, Father Cunningham continued to violate the policy – he spent "extraordinary amounts of time alone with teen boys."  He took them to the movies or for ice cream one-on-one; he wrestled them; he hugged them; he had them alone in his rectory bedroom.

Parish staff observed Father Cunningham's conduct with the boys. The church pastor was aware that Father Cunningham had boys one-on-one alone with him in his rectory bedroom; the pastor informed parish staff that Father Cunningham was not allowed to have minors alone with him in his rectory bedroom.

One of these boys was Doe 2 – Father Cunningham regularly wrestled with him and spent time with him alone in his rectory bedroom. At least one other priest, Father Gleason, "expressed concern" about Father Cunningham bringing Doe 2 into the rectory. There were two incidents in which Father Cunningham wrestled with Doe 2 until one of Doe 2's family members stopped the wrestling when they believed the physical contact was inappropriate. In one such incident, Father Cunningham's groin was pressing against the child's rear end. When Doe 2 was 12 or 13, Father Cunningham took him alone to the movies and, during the movie, massaged the boy's genitals with his hand. Sometime later, he invited Doe 2 to his rectory bedroom. There, he told the boy that the Holy Spirit had a special connection with them and that was why they had a special way of showing affection, which nobody else could understand – Father Cunningham was groping the boy as he said this, and continued to engage in further sexual conduct. Doe 2 did not report this because Father Cunningham "was his friend and priest, because he believed him, because he loved him and trusted him."

Doe 3 worked in the parish office. Father Cunningham wrestled with Doe 3 in his rectory bedroom. Father Gleason, the priest who had "expressed concern" about Father Cunningham bringing Doe 2 into the rectory, warned Doe 3 "not to trust Father Cunningham." Shortly after this warning, Father

Cunningham came into the office where Doe 3 was working alone and molested him by touching his genitals.

Doe 4 was an altar server at St. Mary's. Father Cunningham molested him as well, hugging him, caressing his lower back, and putting his fingers inside Doe 4's pants. Doe 4, who was then 15, felt like Father Cunningham was making a sexual advance and he felt trapped. He told his mother that he did not want to be around Father Cunningham anymore. His mother agreed that he need not be. She then paid more attention to Father Cunningham and learned that he invited many boys out one-on-one. She suspected that he may be acting inappropriately with the boys.

Plaintiffs also alleged that Father Miskella, another priest at St. Mary's, wrote an evaluation in which he characterized Father Cunningham as too "immature." Immature "has been a code word used by Catholic Clergy for many years to describe a priest who spends too much time with minors and who is possibly sexually abusing them." Father Miskella also confidentially informed the Vicar for Clergy that he should speak with Father Gleason about Father Cunningham. Father Miskella concluded that Father Cunningham "is not mature enough to be a pastor." There is no indication that "any effort was made to discuss with Father Gleason his concerns or thoughts regarding Father Cunningham."

In 1998, a new priest became the administrator at St. Mary. Having learned that Father Cunningham had an underage boy in his rectory bedroom, the administrator counseled him not to do this. He also reported to the Archdiocese that "Father Cunningham was immature and had instances of imprudent conduct." There was no follow-up.

In 1999, a complaint was made to the Vicar for Clergy that Father Cunningham had molested a minor (not one of the plaintiffs here). The Vicar for Clergy subsequently acknowledged that complaint in a letter, which also stated that "all such records were going to be maintained permanently" by the Archdiocese, but those records are presently missing. There is no record that the Archdiocese conducted any investigation into the complaint.

D. *Third Parish – Does 5, 6 and 7*

In 1999, Father Cunningham was transferred to St. Lawrence Martyr, still as an associate pastor. He immediately resumed "taking underage parish boys on unchaperoned outings, wrestling them, tickling them, hugging them, and having them in his rectory bedroom." All of this conduct was known to parish priests.

Doe 5 was a student at St. Lawrence Martyr; Father Cunningham sexually abused him on multiple occasions on school grounds and during school activities – including, at one point, reaching into the boy's gym shorts and touching his genitals. Doe 5 told his mother that Father Cunningham was "harassing" him. His mother reported this to church staff, but nobody followed up on Doe 5's complaints with him, and Father Cunningham's behavior continued unchecked. When the school year ended, Doe 5 and his mother stopped attending that church. The head pastor, Monsignor Lenihan, telephoned and apologized to Doe 5's mother for Father Cunningham's conduct, explaining that he "was immature and that he had maturity issues."

The complaint alleged that Does 6 and 7 were also molested by Father Cunningham at St. Lawrence Martyr. It began with wrestling, hugging, and tickling, and escalated to Father Cunningham having the boys alone in his rectory bedroom where

8

he "sexually molested them in significant ways." This behavior continued until shortly before Father Cunningham left the parish in 2001. Parish staff members were aware that Father Cunningham had underage boys alone in his rectory bedroom; at least one parish staff member reported this to the head pastor, Monsignor Lenihan. Instead of taking action to address the complaint, Monsignor Lenihan "actively championed" Father Cunningham and supported him so that he would be promoted from associate pastor to pastor of his own parish.

E.    *Aftermath*

In 2001, Father Cunningham was promoted to pastor and assigned to another parish. He allegedly continued his inappropriate conduct with boys. In 2004, he was assigned to yet another parish, and his molestation continued. Finally, after he was discovered (on a group trip to Europe) alone in a hotel room with a boy, holding the boy's belt in his hands, Father Cunningham took a leave of absence from his position.

In 2008, Father Cunningham was listed on an Archdiocese document as "having a credible allegation of child sexual abuse having been made against him."

Plaintiffs also alleged that in 2015, another victim of Father Cunningham's – who is not a plaintiff in this action and whom we refer to as Roe – brought suit against Father Cunningham. In 2017, the Los Angeles County Sheriff Department began a criminal investigation into complaints against Father Cunningham. The Archdiocese had continuously paid for Father Cunningham's maintenance and support since 2005, and did not stop in response to Roe's civil suit or the criminal investigation. The Archdiocese paid for lawyers to defend him, hired an investigator to "dig up dirt" on his victims,

9

paid for Father Cunningham to fly to Los Angeles to attend depositions of the victims "in an attempt to intimidate them and silence them," and tried to sway the prosecution away from bringing charges. In January 2019, the Archdiocese settled the civil action brought by Roe for "a life-changing" sum.

### 3. *The Complaint*

Plaintiffs filed their original complaint in this case on June 10, 2019.[2] The first amended complaint was filed one month later. The complaint states three causes of action, although only the first two are at issue on this appeal.[3]

Before proceeding to the formal causes of action, the complaint sets forth the lengthy history of Father Cunningham's abuse of minors within the church, including his specific molestation of the seven plaintiffs. We have summarized those allegations above. The complaint also includes general allegations that the Archdiocese, through its "agents and managing agents, knew of prior complaints that Father Christopher Cunningham had sexually molested a minor(s), prior to the end of his abuse of Plaintiffs. [The Archdiocese] through [its] agents and managing agents, knew or had reason to know that Father Christopher Cunningham routinely violated rules of Defendants that were designed to prevent child molestation by

---

[2] Some of the plaintiffs in this action had previously filed separate actions, which they then voluntarily dismissed without prejudice, prior to bringing this action.

[3] The third cause of action was for violation of civil rights under the Unruh Civil Rights Act. (Civ. Code, § 51.) In response to the defendants' demurrer, plaintiffs agreed to withdraw this claim. Ultimately, plaintiffs orally dismissed the Unruh Act cause of action with prejudice.

10

clergy." It further alleges that Father Cunningham was a "priest, employee and an agent" of the Archdiocese when he met the plaintiffs and abused them. It alleges that, at all times, the Archdiocese, "employed, supervised and controlled the employment as a priest of" Father Cunningham, as well as the other employees and agents at the churches where he worked.

The first cause of action is for "Child Sexual Abuse/Sexual Battery." It alleges that the Archdiocese is vicariously liable for the sexual abuse committed by Father Cunningham because it both authorized and ratified the abuse. Plaintiffs alleged that the Archdiocese "ratified and/or approved of the sexual misconduct by failing to adequately investigate, discharge, discipline or supervise" Father Cunningham. They allege the Archdiocese further ratified the abuse by "concealing evidence of sexual abuse of other children by" Father Cunningham from plaintiffs, their families, law enforcement, and other Archdiocese personnel "who could have been in a position to prevent the abuse of Plaintiffs" if they had known of the prior complaints.

The complaint alleged, "Defendants have routinely over the years failed to discipline, investigate or terminate known child molesting priests. Instead, Defendants condoned the conduct of priests molesting children by protecting offending clerics from public scorn and civil authorities, often transferring them from town to town, county to county, state to state, and country to country, all to allow child molesting priests to escape prosecution and protect their reputations, as well as the reputation of the Defendants. By doing so, Defendants have systematically encouraged and condoned this conduct by more priests including Father Christopher Cunningham."

11

In support of this claim, the complaint expressly relied on the fact that, upon learning of Roe's civil complaint against Father Cunningham and the criminal investigation, the Archdiocese stood by Father Cunningham by paying for his personal lawyer and supporting his defense.

The second cause of action is for negligence. Plaintiffs alleged that the Archdiocese had a special relationship with the children entrusted to its care, which gave rise to a duty to protect them from harm. Plaintiffs alleged, "Defendants, by and through their agents, servants and employees, knew or reasonably should have known of Father Christopher Cunningham's dangerous and exploitive propensities and/or that Father Christopher Cunningham was an unfit agent. It was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to children in their care, including but not limited to the Plaintiffs, the children entrusted to Defendants' care would be vulnerable to sexual abuse by Father Christopher Cunningham."

Plaintiffs alleged that defendants breached this duty of care by allowing Father Cunningham "to come into contact with the minor Plaintiffs without supervision; by failing to adequately supervise, or negligently retaining Father Christopher Cunningham who they permitted and enabled to have access to Plaintiffs; by failing to investigate or otherwise confirm or deny such facts about Father Christopher Cunningham; by failing to tell or concealing from Plaintiffs, Plaintiffs' parents, guardians, or law enforcement officials that Father Christopher Cunningham was or may have been sexually abusing minors; and/or by holding out Father Christopher Cunningham to the

12

Plaintiffs and their parents or guardians as being in good standing and trustworthy."

Next, plaintiffs alleged that the Archdiocese had a duty "to educate, train and warn" plaintiffs "regarding prevention, detection and reporting of child abuse" to help safeguard them, but failed to do so. Plaintiffs also alleged a breach of duty arising from the Archdiocese's decision to give copies of its written policies for the prevention of child molestation only to priests. The Archdiocese also had a duty to provide the policies to nonpriest parish staff and parents in the community, people who could have reported that Father Cunningham was routinely violating these policies.

Finally, plaintiffs alleged that a number of parish staff members who witnessed Father Cunningham's suspicious conduct were mandated reporters under Penal Code section 11165.7, but the Archdiocese violated its obligation under the law to educate them about their reporting duties – a violation which was a proximate cause of plaintiffs' abuse.[4]

4. ***The Demurrer***

On August 29, 2019, defendants demurred. The demurrer raised numerous grounds, including misjoinder of plaintiffs, misjoinder of defendants, and failure to state a cause of action.[5]

---

[4] Mandated reporters under Penal Code section 11165.7 include teachers, teacher's assistants, private school administrative officers, clergy members, and custodians of records of clergy members.

[5] Although we refer to the defendants collectively as "the Archdiocese," the complaint was filed against a number of different defendants, and the defendants argued as part of their demurrer that several of them were improperly named because

13

Plaintiffs opposed the demurrer.  The trial court heard the demurrer and anti-SLAPP motion together.

**5.** ***The Anti-SLAPP Motion***

On September 25, 2019, the Archdiocese filed its anti-SLAPP motion.

A. *Overview of Anti-SLAPP Motions*

An anti-SLAPP motion presents a means by which a defendant, sued for conduct in furtherance of the constitutional right of petition or free speech, can place the burden on a plaintiff to establish that there is a probability of prevailing on the claim or face early dismissal of the action.  (Code Civ. Proc., § 425.16, subd. (b)(1).)  If the defendant first establishes a prima facie showing that a claim is based on so-called "protected activity," the burden switches to the plaintiff to establish the lawsuit has at least minimal merit.  (*Park, supra,* 2 Cal.5th at p. 1061.)

Before a court can proceed to the second prong, the moving defendant must satisfy the first prong – that is, establish that the cause of action arises from protected activity, as the term is defined by statute.  Code of Civil Procedure section 425.16, subdivision (e) is the operative provision and describes four categories of protected speech and conduct:  "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in

the complaint did not specifically identify what each defendant purportedly did to be liable to each plaintiff.

14

connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or issue of public interest."

B.    *Defendants' Anti-SLAPP Motion*

Here, the Archdiocese's anti-SLAPP motion argued that the complaint was based on both protected speech and litigation conduct.

As to the first cause of action for sex abuse, the Archdiocese argued that the only allegations against it were its support of Father Cunningham in Roe's civil action and the sheriff's criminal investigation – conduct it argued was all protected litigation activity.

As to the negligence cause of action, the Archdiocese focused on a handful of allegations from plaintiffs' complaint which could be characterized as speech – or, more precisely, the decision not to speak – on an issue of public interest, and argued that those allegations were, in fact, the basis of the complaint against it. Those allegations were: (1) the failure to inform parish communities about allegations of abuse against Father Cunningham and instead holding him out as trustworthy; (2) the failure to communicate the Archdiocese's policy for the prevention of molestation to nonpriest staff and members of the community; (3) the failure to educate, train and warn plaintiffs about sex abuse; and (4) the failure to inform staff who were mandated reporters about their duties as mandated reporters under the law.

C.    *Plaintiffs' Opposition*

Plaintiffs' opposition to the motion argued that the speech and petitioning conduct identified in the Archdiocese's motion

was merely supporting evidence of the Archdiocese's vicarious liability, not the tortious acts on which the complaint was based. Plaintiffs argued the complaint was about conduct: Father Cunningham's sexual abuse and the Archdiocese's "failures to take appropriate steps to prevent that abuse."

As to the first cause of action, plaintiffs argued that the Archdiocese's payment of Father Cunningham's attorney fees was merely evidence of the Archdiocese's ratification of his molestation. But it was the ratification itself that was actionable. Plaintiffs explained that the Archdiocese was aware of Father Cunningham's molestation and routine violation of its policies for the prevention of molestation. Plaintiffs argued that, despite that knowledge, the Archdiocese ratified Father Cunningham's conduct by its failure to "investigate, discipline or better supervise him," its "withholding of or destruction of records of complaints," its "promotion of Father Cunningham after such complaints," and its "support of him financially throughout."

Plaintiffs argued that their negligence cause of action was based on multiple theories, including negligent supervision and retention of Father Cunningham, which is not protected speech or litigation activity. To the extent it was also based on negligent failure to comply with mandatory reporter statutes and a negligent failure to educate, train, or warn, plaintiffs argued that inaction does not rise to the status of protected conduct.

D.    *The Archdiocese's Reply*

In reply, the Archdiocese acknowledged that plaintiffs took the position that the conduct on which they based their first cause of action was the molestation itself. But, they responded, "[t]hat, however, is contrary to the allegation that the acts that make the Archdiocese liable 'in the present case' are actions in

16

the prior [Roe] litigation. [Citation.] There is no claim against Cunningham in this case. The allegations regarding Cunningham and molestation are 'Background Facts.' [Citation.] The alleged 'liability-creating activity' of the Defendants for ratification is acts in furtherance of the right to petition the Court."

As to negligence, the Archdiocese re-asserted that the negligence claims arose out of protected speech, and more precisely, its decision to not speak.

E.  *Hearing, Ruling and Appeal*

After spirited argument, the trial court stated that, when focusing on the allegations of the complaint, "[t]his case is really about, allegation-wise, a failure to properly investigate and train and report acts of child abuse and at what level there should have been training, at what level there should have been reporting." The court rejected the Archdiocese's argument that the first cause of action arose from its litigation conduct, concluding, "it's clear that plaintiffs' cause of action for sexual assault and sexual battery is based upon and seeks to recover damages for Father Cunningham's improper sexual conduct related to the plaintiffs," and the Archdiocese's vicarious liability for it. Accordingly, the court concluded the complaint did not allege conduct protected by the anti-SLAPP law.

As to the cause of action for negligence, the court found that it alleged a breach of duty of care by allowing Father Cunningham to come into contact with the plaintiffs without adequate supervision, negligently retaining him, failing to investigate allegations of misconduct, concealing from plaintiffs, their parents and law enforcement that Father Cunningham was or may have been sexually harassing children, and holding

17

Father Cunningham out as trustworthy. While the court recognized there may be speech, or lack of speech, involved, the court believed that, viewed in its entirety, the gravamen of the cause of action was not protected conduct. The anti-SLAPP motion was denied.[6]

The court then turned to the demurrer, and sustained it on several grounds with leave to amend.[7]

The Archdiocese filed a timely notice of appeal from the denial of its anti-SLAPP motion.

---

[6] On appeal, the Archdiocese characterizes the trial court's ruling as follows: "Even though it found that no claim was legally sufficient, it denied the motion because it disapproved of the petitioning and speech activities involved." The suggestion that the court based its ruling on anything other than an application of the law to the facts alleged has no place in the Archdiocese's opening brief (see Bus. & Prof. Code, § 6068, subd. (c)) and, equally to the point, is unsupported by the record.

[7] The trial court's ruling on the demurrer was as follows:
"The Demurrer is OVERRULED on commonality ground. The Demurrer is SUSTAINED as to specificity ground. The Court sustains the demurrer as to the 4th, 8th to 16th causes of action. The Court overrules the demurrer as to 1st, 2nd, 3rd, 5th, 6th, 7th, and 17th causes of action.

"The Court grants 30 days leave to amend. Counsel are to meet and confer on the issue."

By "causes of action," we presume the court was referring to the multiple enumerated grounds expressly asserted in the demurrer; the complaint had only three causes of action, one of which plaintiffs dismissed.

The parties disagree whether the court's ruling reflected its view of the substantive merits of the complaint. As the ruling on the demurrer is not before us on appeal, we express no opinion.

## DISCUSSION

### 1. *Standard of Review*

"We review de novo the grant or denial of an anti-SLAPP motion. [Citation.] We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity. [Citations.] In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based. [Citations.] We do not, however, weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law. [Citation.]" (*Park, supra,* 2 Cal.5th at p. 1067.)

"A claim arises from protected activity when that activity underlies or forms the basis for the claim. [Citation.] Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' [Citations.]" (*Park, supra,* 2 Cal.5th at pp. 1062-1063.) "To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' [Citation.] Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute. [Citations.]" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.)

We consider separately the extant two causes of action alleged in the complaint.[8]

---

[8] Under *Baral v. Schnitt* (2016) 1 Cal.5th 376, 392-393, a defendant may direct an anti-SLAPP motion to a distinct claim based on allegations of protected activity within single a cause of

**2. *First Cause of Action – Child Sexual Abuse/Sexual Battery***

Plaintiffs' first cause of action is for child sexual abuse/sexual battery, and alleges the Archdiocese is liable for Father Cunningham's molestation of plaintiffs due to its authorization and ratification of that conduct.

" 'As an alternate theory to respondeat superior, an employer may be liable for an employee's act where the employer either authorized the tortious act or subsequently ratified an originally unauthorized tort. [Citations.] The failure to discharge an employee who has committed misconduct may be evidence of ratification. [Citations.] The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery. [Citations.] Whether an employer has ratified an employee's conduct is generally a factual question. [Citation.]' [Citations.]" (*C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1110-1111.) "A principal may be liable when it ratifies an originally unauthorized tort.

---

action which alleges both protected and unprotected activity. Here, although the notice of motion filed by the Archdiocese suggested it was directed to individual allegations of protected activity, the motion itself argued that the *entirety* of each cause of action arose from protected activity. The Archdiocese does not contend that plaintiffs alleged a mixed cause of action. Rather, it contends, by selective citation to the complaint, that plaintiffs' claims arise out of public statements and alleged nondisclosures. On appeal, the Archdiocese cites *Baral* but not for the point that the trial court should have granted the anti-SLAPP motion as to certain allegations even if court was correct in denying the motion as to other parts of the complaint.

[Citations.] And generally, the ratification relates back to the time the tortious act occurred. [Citations.] As noted, ratification may occur when an employer learns of misconduct and fails to discharge an agent or employee. [Citations.]" (*Id.* at p. 1111.)

The Archdiocese argues that it has established the child sexual abuse cause of action arises from protected activity because it is based on the Archdiocese's conduct in the Roe litigation and sheriff's investigation. We are unpersuaded for two reasons. First, the argument is based on a mischaracterization of the complaint. Second, it is without legal merit.

A.     *The Archdiocese Mischaracterizes the Complaint*

The first amended complaint exceeds 50 pages. Before reciting the causes of action, it sets forth, at great length, the course of Father Cunningham's employment with the Archdiocese, his molestation of the plaintiffs, and the Archdiocese's failure to respond to the reports and suspicions of victims, parents, priests, and other parish staff. Although the specific allegations within that part of the complaint entitled, "First Cause of Action [¶] Child Sexual Abuse/Sexual Battery" encompass only four pages of the complaint, the first cause of action incorporates by reference "all paragraphs of this Complaint, as if fully set forth herein."

The Archdiocese overlooks this salient incorporation by reference, and asserts instead that the cause of action is limited to the allegations of those four pages. It then dismisses the first page of those allegations as "a string of generalizations." Among those allegations the Archdiocese finds dismissable are the incorporation by reference paragraph, and the paragraph alleging as follows: "For the reasons set forth in the incorporated paragraphs of this Complaint, the sexual abuse of Plaintiffs by

21

Father Christopher Cunningham arose from, was incidental to Father Christopher Cunningham's employment with Defendants, and each of these Defendants ratified or approved of Father Christopher Cunningham's sexual abuse of minors, including Plaintiffs.  Plaintiffs allege on information and belief that Defendants ratified and/or approved of the sexual misconduct by failing to adequately investigate, discharge, discipline or supervise Father Christopher Cunningham or other priests known by Defendants to have sexually abused children, or to have been accused of sexually abusing children.  Defendants and each of them ratified Father Christopher Cunningham's abuse by concealing evidence of sexual abuse of other children by Father Christopher Cunningham and other priests from Plaintiffs, Plaintiffs' parents, other families with children, law enforcement, and personnel of Defendants who could have been in a position to prevent the abuse of Plaintiffs and others if they had known of complaints of Father Christopher Cunningham's sexual abuse of children, and prior complaints of other priests of sexual abuse of children."

Having excised from the complaint any allegations that do not fit within its restrictive view of the pleading, the Archdiocese argues that the only allegations of wrongful conduct against it are those which arise from its defense of Father Cunningham in the Roe lawsuit and the criminal investigation.  The Archdiocese asserts, "Neither the entirety of the Complaint nor Cunningham's conduct was the question presented to the Court.  The alleged basis for Defendants' liability is the litigation activity that ratified the abuse."

We disagree.  In our review of the anti-SLAPP motion we do not ignore 23 pages of specific allegations of, among other

22

things: (1) Father Cunningham's sexual abuse of plaintiffs; (2) Father Cunningham's repeated violation of the Archdiocese's policy to prevent molestation; (3) priests' and other parish employees' knowledge of Father Cunningham's violations of this policy; (4) complaints by parishioners against Father Cunningham; (5) statements acknowledging that Father Cunningham was "immature" – the code for suspicions of molestation; (6) repeated failures to investigate; (7) the disappearance of files containing complaints about Father Cunningham; and (8) the reassignments and promotion of Father Cunningham that allowed the molestation to continue. We find it is this conduct that forms the basis of the allegations against the Archdiocese, not the selected allegations that ratification was also evidenced by the Archdiocese's defense of Father Cunningham in the Roe case and the criminal investigation.

Because the Archdiocese chooses to ignore the bulk of the allegations of the complaint against it, it makes no attempt to argue that these actual allegations are protected activity under the anti-SLAPP law.

B.      *The Argument Is Without Merit*

The first cause of action is for child sexual abuse; there is no allegation that the Archdiocese would be liable simply for its litigation conduct in the absence of the sexual abuse the Archdiocese allegedly ratified. Plaintiffs are not alleging, for example, that the Archdiocese defamed them in motions in limine, or that its payment of Father Cunningham's defense costs was an improper use of parishioners' contributions. Plaintiffs are alleging that this conduct is actionable only to the extent that it evidences the Archdiocese's ratification of Father Cunningham's molestation.

"[A] claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park*, *supra*, 2 Cal.5th at p. 1060.) Contrary to the Archdiocese's contention, plaintiffs' sexual abuse claim does not arise from its public statements and alleged nondisclosures. Instead, the complaint's allegations that the Archdiocese knew that Father Cunningham violated policies to prevent molestation, destroyed or hid files containing complaints about him, and reassigned and promoted him to other parishes in which he continued to molest children demonstrate that plaintiffs' claims of sexual abuse did not arise from public statements or nondisclosure but from the Archdiocese's role in abetting Father Cunningham's continuing abuse.

Not only is the litigation conduct on which the Archdiocese focuses mere evidence of liability, it is evidence of the Archdiocese's ratification of the tort, not the tort itself (the sexual abuse). When a plaintiff seeks to hold a defendant vicariously liable for another party's tortious conduct, the court's anti-SLAPP analysis focuses on the underlying tort, not the conduct by which the defendant is allegedly vicariously liable. (See *Simmons v. Bauer Media Group USA, LLC* (2020) 50 Cal.App.5th 1037, 1046-1047 [hiring the party who committed the tort; tort governs for anti-SLAPP purposes]; *Spencer v. Mowat* (2020) 46 Cal.App.5th 1024, 1037 [conspiring with the parties who committed the tort; tort governs]; *Novartis Vaccines & Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2006) 143 Cal.App.4th 1284, 1295-1297 [conspiring to commit the tort and ratifying it; tort governs]; but cf. *Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 399, 409-410 [attorney sued for conspiring with his client

24

merely by providing routine legal services; attorney's conduct governs].)

Here, then, the focus must be on the alleged acts of sexual abuse and battery that form the basis of the tort cause of action, not the acts of the Archdiocese by which it is alleged to be vicariously liable for those acts. Those underlying tortious acts are not protected activity.

### 3. *Second Cause of Action - Negligence*

A similar analysis defeats the Archdiocese's argument that the negligence cause of action is based on protected speech. Here, a number of the plaintiffs were specifically alleged to have been students at parish schools. We start with some basic rules about the legal duty owed to school children.

"Ample case authority establishes that school personnel owe students under their supervision a protective duty of ordinary care, for breach of which the school district may be held vicariously liable. [Citations.]" (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 865.) Because of the special relationship a school district and its employees have with the students, the duty of care owed by school personnel includes "the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally." (*Id.* at pp. 869-870.) A "school district is liable 'for the negligence of supervisory or administrative personnel who knew, or should have known' of the foreseeable risk to students of sexual abuse by an employee and nevertheless hired, retained, and/or inadequately supervised that employee. [Citation.]" (*D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 223.)

25

A.    *The Archdiocese Mischaracterizes the Complaint*

Prior to the complaint's allegations of "Background Facts," plaintiffs alleged, by way of introduction, that in 2018, the Archdiocese publicly apologized for child sexual abuse suffered at the hands of priests, and represented that the Church needed to be transparent about the perpetrators and vigilant in its investigations of allegations of misconduct.  The complaint goes on to suggest, however, that this public statement of concern was "very different from the way" the Archdiocese was actually treating victims of abuse; similarly, the public statement of vigilant investigations was contradicted by the Archdiocese's actual practice of hiding evidence and denying abuse.

Focusing on this introductory language, the Archdiocese takes the position that the negligence cause of action "attempts to craft a negligence claim out of an alleged conflict between the Archdiocese's positive public statements about its response to accusations of abuse and alleged failures:  to inform parish communities and public authorities that Cunningham 'may have been' abusing minors, to publish Priests' policies to non-Priests and to inform staff about mandated reporters' duties."  By linking selected allegations of the negligence cause of action to the "positive public statements," the Archdiocese argues that the cause of action for negligence arises from its protected conduct in furtherance of speech.

Once again, the Archdiocese engages in a selective reading of the first amended complaint.  The negligence cause of action alleges, in successive paragraphs:  (1) defendants had a duty to protect plaintiffs; (2) Father Cunningham was able to molest plaintiffs due to the access and authority he had as a Catholic priest; and (3) the Archdiocese knew or should have known of

26

Father Cunningham's "dangerous and exploitive propensities and/or that Father Christopher Cunningham was an unfit agent." This is then followed by paragraph 120, which alleges, "Defendants breached their duty of care to the minor Plaintiffs by allowing Father Christopher Cunningham to come into contact with the minor Plaintiffs without supervision; by failing to adequately supervise, or negligently retaining Father Christopher Cunningham who they permitted and enabled to have access to Plaintiff[s]; by failing to investigate or otherwise confirm or deny such facts about Father Christopher Cunningham; by failing to tell or concealing from Plaintiffs, Plaintiffs' parents, guardians, or law enforcement officials that Father Christopher Cunningham was or may have been sexually abusing minors; and/or by holding out Father Christopher Cunningham to the Plaintiffs and their parents or guardians as being in good standing and trustworthy. As a Priest, Father Christopher Cunningham was expected to minister to parish families. Defendants acknowledged and expect that parish priests should visit parishioners' homes as part of their duties as priests. Father Christopher Cunningham visited family homes like Plaintiffs' as part of his expected functions. Defendants cloaked within the facade of normalcy Defendants' and/or Father Christopher Cunningham's contact and/or actions with the Plaintiffs and/or with other minors who were victims of Father Christopher Cunningham, and/or disguised the nature of the sexual abuse and contact."

The Archdiocese disposes of this paragraph by saying it "has a series of conclusory allegations strung together with an ineffable 'and/or.' That Paragraph is immaterial and cannot

27

change the allegation that the activity giving rise to the claim for relief is protected 'failure to inform.' "

To the extent the allegations are conclusory, they are reinforced by the specific allegations of fact in the preceding pages of the complaint. The numerous allegations of nonspeech-related negligent conduct – failure to supervise, negligent retention, failure to investigate – which form the bulk of this cause of action cannot be simply brushed away because the Archdiocese would rather categorize this cause of action as "failure to inform."

The Archdiocese argues: "The only activity alleged here as the basis for the negligent supervision theory is that Defendants 'publicly purported' to implement a policy of informing 'parish communities' about accusations of abuse by a Priest but 'never informed' parish communities that Cunningham had been accused and failed to tell or concealed from 'Plaintiffs, Plaintiffs' parents, guardians, or law enforcement' that Cunningham 'was or may have been' abusing minors and/or holding out Cunningham as being in good standing and trustworthy. [Citations.] Everything else in Paragraph 120 is immaterial."

In our view, the "failure to supervise" allegation is not limited to failure to inform, but refers much more broadly to the Archdiocese's failure to supervise its employee who was molesting children. For example, plaintiffs specifically alleged that: (1) Father Gleason expressed concern that Father Cunningham was bringing boys into the rectory and warned Doe 3 "not to trust" Father Cunningham; (2) Father Miskella evaluated Father Cunningham as too immature to be a pastor and confidentially informed the Vicar for Clergy that he should speak with Father Gleason about Father Cunningham; but

28

(3) the Vicar for Clergy did not do so; and (4) these and other red flags were ignored and Father Cunningham was free to continue molesting children unsupervised. All of these allegations are brushed aside in the Archdiocese's effort to squeeze plaintiffs' negligence cause of action into the realm of protected speech.

B. *The Argument Is Legally Meritless*

Even if we agreed that the negligence cause of action was limited to allegations based on a failure to inform plaintiffs of the danger presented by Father Cunningham, we would still conclude the cause of action was not based on protected speech.[9]

As explained by our Supreme Court in *Park,* "a claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity. Rather, a claim may be struck only if the speech or petitioning activity itself is the wrong complained of, and not just evidence of liability or *a step leading to some different act for which liability is asserted.*" (*Park, supra,* 2 Cal.5th at p. 1060, italics added.)

As we alluded to earlier, there may be some legal claims involving child abuse that can be fairly said to be based on protected activity and thus may properly be subject to anti-SLAPP motions. To add another example, if a religious institution were to inform its community of allegations that one

---

[9] The Archdiocese argues that the complaint is not limited to a failure to inform plaintiffs of the risk presented by Father Cunningham, but also includes allegations of a failure to inform nonpriest parish employees of the policy to prevent molestation and a failure to inform mandated reporters of their statutory duties. Our analysis is the same with respect to all three types of failure to inform.

of its youth leaders was involved in an inappropriate sexual relationship with a minor, and the accused sues the institution for defamation, the cause of action arises from speech concerning a matter of public interest. (*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1539, 1546.)

This is consistent with *Park*; the tortious conduct in our example is the making of the statement itself. But that does not mean that when, as here, a church is sued for negligence for failing to so warn its members, that the negligence cause of action similarly arises from speech. In the defamation example, it is the making of the statement itself which is alleged as the injury-producing conduct. But in the case of a negligent failure to warn, it is not the failure to speak which directly caused injury, but the fact that the priest about whom warning should have been made went on to molest children. The failure to warn is a mere step leading to the molestation for which liability is asserted.

This is particularly so here, where, despite the Archdiocese's argument to the contrary, the negligence cause of action is not restricted to failure to inform. The failure to inform is merely one element of an overall failure to supervise, which failure is alleged to have also included failures to report wrongdoing observed in violation of the Archdiocese's own policies; failures to document complaints when they were made; and failures to investigate complaints when they were made. Most critically, the complaint alleges that the Archdiocese knew Father Cunningham was openly violating the Archdiocese's policies to prevent molestation, and the only response by his supervisors was to counsel him not to do that – a response the complaint alleges was clearly inadequate. While failure to inform

is a part of the Archdiocese's failure to supervise Father Cunningham, liability is based on the failure to supervise, not the particular words unspoken.

**4.** ***The Ruling on the Demurrer Is Not Before Us***

The Archdiocese argues that the trial court's ruling sustaining its demurrer with leave to amend is binding on our analysis. Specifically, the Archdiocese suggests that the order was appealable, and the plaintiffs' failure to cross-appeal the order renders it res judicata on the issue of whether their complaint stated a claim and the likelihood that plaintiffs will prevail on the merits under the second prong of the anti-SLAPP statute. We disagree.

An order sustaining a demurrer with leave to amend is not a final judgment and is not otherwise itemized among appealable orders. (Code Civ. Proc., § 904.1.) The Archdiocese's argument is based on section 906, which provides, in pertinent part, "Upon an appeal pursuant to Section 904.1 or 904.2, the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party . . . ."

The Archdiocese argues that Code of Civil Procedure section 906, renders the demurrer ruling not merely reviewable, but *appealable* under *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719 (*Fontani*), disapproved on other grounds by *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 203, footnote 5. Plaintiffs' failure to appeal the adverse ruling on demurrer, the argument continues, means that plaintiffs are stuck with an adverse ruling on the validity of its complaint.

31

In *Fontani*, the trial court denied an anti-SLAPP motion and overruled the bulk of a demurrer. The defendant appealed and the Court of Appeal reversed the denial of the anti-SLAPP motion. The defendant asked that the appellate court also address the order overruling part of its demurrer under Code of Civil Procedure section 906. The court declined on the basis that the demurrer ruling did not substantially affect the defendant's rights. (*Fontani, supra,* 129 Cal.App.4th at p. 736.) In the course of its discussion, however, the court stated, "Section 906 does allow for an appeal from an interlocutory order that involves the merits of, or necessarily affects, an anti-SLAPP order from which an appeal is taken. In other words, where the propriety of an otherwise nonappealable order affects the validity of an anti-SLAPP order, an appeal will lie from the otherwise nonappealable order. (See *City of Oakland v. Darbee* (1951) 102 Cal.App.2d 493, 504 [227 P.2d 909] [otherwise nonappealable order for separation reviewable on proper appeal from order for transfer because validity of order for transfer depended on validity of order for separation].)" (*Ibid.*) This dicta, on which the Archdiocese relies, mischaracterizes section 906. Section 906 simply provides that, on appeal of an otherwise appealable order or judgment, the court may *review* any intermediate ruling which necessarily affects the order appealed from. It does not render an otherwise nonappealable intermediate ruling *appealable*, and we disagree with any language in *Fontani* which suggests otherwise.[10]

---

[10] The only case that *Fontani* cites in the passage quoted in the text, *City of Oakland v. Darbee, supra,* 102 Cal.App.2d 493, supports our conclusion. There, the plaintiff had brought an eminent domain action against a number of defendants or groups

Even under the reviewable rule, the demurrer ruling in our case is not reviewable. A second case cited by the Archdiocese, *Maranatha Corrections, LLC v. Department of Corrections and Rehabilitation* (2008) 158 Cal.App.4th 1075, 1084, illustrates why.

Unlike the present appeal, the order sustaining the demurrer in *Maranatha Corrections preceded* the order on the anti-SLAPP motion, so at least as a theoretical matter, the demurrer could have affected the subsequent anti-SLAPP ruling. Here, the ruling on the demurrer did not affect, and could not have affected, the order denying the anti-SLAPP motion: The order on the demurrer came *after* the court had already denied the anti-SLAPP motion.

---

of defendants, each of whom owned a different parcel of property the city sought to condemn. One set of defendants successfully moved to separate the proceeding against them and transfer it to the county in which they resided. The plaintiff appealed the appealable transfer order; but the separation order was not appealable. The Court of Appeal concluded that the separation order could nonetheless be reviewed on appeal from the transfer order, as an intermediate ruling which necessarily affected the transfer order. (*City of Oakland*, at pp. 504-505.) The issue was one of reviewability, not *ab initio* appealability. The holding in *City of Oakland* does not suggest that plaintiffs here could have appealed the demurrer ruling or that the failure to do so had some binding effect on the anti-SLAPP motion.

## *DISPOSITION*

The order denying the anti-SLAPP motion is affirmed.  The Archdiocese shall pay plaintiffs' costs on appeal.


RUBIN, P. J.

I CONCUR:


KIM,  J.

Charles Ratcliff, Jr., et al. v. The Roman Catholic Archbishop of Los Angeles et al.
B302558


BAKER, J., Concurring

I agree the order denying defendants' anti-SLAPP motion should be affirmed because there has been no adequate showing that any of the claims in plaintiffs' complaint should be stricken as arising from activity protected by the anti-SLAPP statute, Code of Civil Procedure section 425.16.  (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060 ["[A] claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of . . ."] (*Park*).)  I write separately to explain I find it unnecessary, in reaching that conclusion, to rely on a judgment about what constitutes the "gravamen" of the lawsuit against defendants or to further cement in anti-SLAPP jurisprudence the rationale advanced in *Spencer v. Mowat* (2020) 46 Cal.App.5th 1024.

Our Supreme Court's anti-SLAPP precedents hold we must determine whether anti-SLAPP protected activity is at issue by considering the elements of the claims asserted by a plaintiff and examining the complaint to determine what actions by a defendant provide the basis for that defendant's asserted liability.  (See, e.g., *Park*, *supra*, 2 Cal.5th at 1063 ["I]n ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability"]; *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1035-1036 (*Ojjeh*).)  At the same time, however, "[a]llegations of protected activity

that are "'"merely incidental" or "collateral"' or that 'merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.'" (*Ojjeh*, *supra*, 43 Cal.App.5th at 1036, citing *Baral v. Schnitt* (2016) 1 Cal.5th 376, 394.)

Here, the basis for defendants' liability is predicated, in essence, on acts that plaintiffs believe amount to authorization or ratification of child sexual abuse and on various repeated alleged failures of supervision (including failure to investigate complaints of abuse and to take appropriate corrective action). In describing the factual predicate for such liability, the operative complaint does at times refer to activity that would be protected under the anti-SLAPP statute—most prominently, allegations that defendants paid attorneys to defend the allegedly abusive priest and to take positions adverse to plaintiffs in court. In my view, however, these references are collateral, often rhetorical, and not included to support a claim for recovery. As such, they cannot be the proper subject of a special motion to strike. (*Ojjeh*, *supra*, 43 Cal.App.5th at 1036.)

I read plaintiffs' briefing in this court to essentially endorse my view, i.e., that allegations concerning defendants' facilitation of attorney representation for the allegedly abusive priest are merely collateral. Insofar as plaintiffs' future prosecution of the suit reveals they instead regard the references to activity that would be protected by the anti-SLAPP statute to be the factual predicate for liability, the trial court would retain discretion to permit defendants to renew their anti-SLAPP challenge. (Code Civ. Proc., §§ 425.16, subd. (f), 1008.)


BAKER, J.


2